UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | NO. 2:06-CR-19 |
| | ) | |
| JIMMY E. SPRAGUE | ) | |

## **REPORT AND RECOMMENDATION**

Defendant has filed a Motion to Suppress all evidence seized upon the execution of two state search warrants. [Doc. 14]. This Motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on October 4, 2006.

Defendant Sprague is charged with knowingly receiving child pornography under 18 U.S.C. §§ 2252A(a)(2), (b)1 and 3571(b)(3). These charges are based upon evidence seized pursuant to two search warrants issued by a Tennessee state court general sessions judge. The first warrant was issued on August 19, 2005, for the defendant's apartment at 1436 Prospect Drive in Kingsport, Tennessee. The second was issued on December 15, 2005, for a search of various computers and electronic storage media taken during the first search.[1]

Not until his opening statement at the suppression hearing did the defendant announce that one basis for attacking the search warrants was that they allegedly contained false or misleading information in the sense of *Franks v. Delaware*, 438 U.S. 154 (1978). He then proceeded, without

---

[1]There was another search warrant for 725 Boone Street, Apartment #2, Kingsport, Tennessee, but neither the memorandum in support of the defendant's motion [Doc. 15] nor the proof and arguments at the hearing addressed that search or what was found as a result.

objection, to call various witnesses. Of course, in the absence of a *Franks* issue, the usual question for the Court is whether there is probable cause for the respective searches set forth in the four corners of the affidavits. The Court will first examine the affidavits to determine if they establish probable cause. Thereafter, the evidence presented by the various witnesses will be discussed.

It is undisputed, as stated in both affidavits, that in January of 1992, defendant pled guilty to sexual exploitation of a fourteen year-old minor in the state criminal court for Loudon County, Tennessee. He was given a one year sentence to community corrections. Later, his probation was revoked and he was ordered to serve his sentence. Before his probation was revoked, he was charged with aggravated sexual battery and two counts of exploitation of minors (ages thirteen and fourteen) in the state criminal court for Knox County, Tennessee. In December of 1992, he pled guilty and received an eight-year prison sentence. He was designated as a "Violent Sexual Offender" under the Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004 ("SOR Act"). On June 24, 2005, defendant filed a petition with the state circuit court in Blountville, Tennessee, seeking relief from paying the required annual registration fee under the Act. He requested court-appointed counsel, and filed an affidavit of indigency in support of that request. Counsel was appointed based upon his affidavit.

On July 27, 2005, defendant was indicted by the Sullivan County Grand Jury, charging that he stalked and harassed a 16 year-old female. In that case, defendant signed yet another affidavit of indigency in support of his application for court-appointed counsel. Kingsport Detective Melanie Adkins, the affiant on both search warrants and the lead investigator in the state criminal case, stated in her affidavit[2] that she "learned of allegations that Jimmy Sprague may be in violation of the SOR Act and may have perjured himself before a Sullivan County, Tennessee court." The potential

---

[2]Filed in support of the first search warrant, issued on August 19.

perjury involved defendant's affidavits of indigency. Detective Adkins thereafter instituted an investigation. She learned from Detective Penny Kindle, also of the Kingsport Police Department, that the defendant had been dressing up as Santa Claus and acting in that role on several occasions at various elementary schools and community centers. Detective Adkins stated in the affidavit, and correctly so, that such activity is prohibited under Tennessee Code Annotated § 40-39-202(4), which prohibits convicted sexual offenders from working with minors, either for profit or for free. Based upon Detective Kindle's information, which was gleaned from neighbors and elementary school employees, Detective Adkins stated it was likely that defendant's residence would contain paraphernalia associated with dressing up as Santa Claus.

The first affidavit also states that defendant, during a statutorily mandated quarterly visit to the Kingsport Police Department, stated under oath that his primary residence was an apartment at 1436 Prospect Drive in Kingsport, Tennessee. It should be noted at this juncture that defendant's rent was federally subsidized by the Department of Housing and Urban Development, based upon his claimed income. Detective Adkins interviewed the manager and district manager of that apartment complex. They told the detective that Mr. Sprague was often absent for several days at a time, and that management had entered his apartment to confirm that he had not moved in violation of the lease. The affidavit states that "[d]uring the course of the inspection, [the manager, Ms. Burkhart] identified the existence of furniture, clothing, and other items that confirmed this to still be Mr. Sprague's primary residence. Additionally, the landlord observed the presence of a computer, which is to be searched or seized."

The first affidavit then states that the SOR Act requires sexual offenders to provide law enforcement with information on any vehicle they may have. The registration form filled out by defendant listed only a 1979 Pontiac. When Detective Adkins checked with NCIC, she discovered that a 1986 Toyota pickup truck and a 1984 Ford F150 pickup truck were also registered to

defendant. The landlord verified that defendant operated all three of these vehicles, and that the two pickup trucks had been towed away by the landlord because they were illegally parked.

The first affidavit next points out that two teenage girls, aged fourteen and sixteen, were listed by defendant as being his daughters and residing with him on his affidavit of indigency in the pending state criminal case. However, he did not list them on his quarterly SOR registration one month earlier. Also, the presiding Judge in the criminal case had found that Mr. Sprague had never legitimated the two girls. There was thus confusion and concern over whether defendant had parental rights regarding the two minors he claimed were living with him at this residence.

The first affidavit then relates what the affiant's experience suggested likely would be found. Detective Adkins stated that books, records, receipts, etc. relating to the "rental, lease or purchase of primary or secondary residences" would likely be found on the premises. Also, information regarding the ownership of the vehicles would likely be there, as would documents and other items relating to defendant's assets and the identities of the minor children residing there. Finally, the first affidavit states that "electronic devices (computers, computer peripheral devices, pagers, cell phones, palm pilots) are used to store and maintain many of the above-mentioned items." The affidavit concludes by stating that often the assistance of a skilled computer technician is necessary to safely retrieve such information, and that for that reason the computer would very likely need to be transported elsewhere for such examination.

In the affidavit supplied in support of the December 15th, 2005, search warrant, Detective Adkins begins by reciting a good deal of the information which was contained in the first affidavit. Then it details the disturbing evidence found during the execution of the first search warrant. First of all, Detective Adkins relates that she "observed in plain view, children's clothes, children's videos alongside adult pornographic videos, children's toys, children's books, children's games, and other children's items . . . [and] . . . [i]n plain view was a "Santa" uniform . . . ." After reiterating

the information from the first affidavit regarding Mr. Sprague's numerous portrayals of Santa at various venues, Detective Adkins related how, in her experience, sexual predators "put themselves in situations where they are likely to encounter children...," such as posing as Santa. She then stated that in her experience, child molesters employ computers in various ways, including gathering more child pornography and using them to establish contact with potential victims. Detective Adkins then stated that the recent criminal history of defendant along with what she found at the apartment indicated that he was engaged currently in sexual crimes against children. This second affidavit mentioned Detective Adkins' interview of the teenager who was the alleged victim in the then pending state criminal action which had led to the application for the first warrant. Several phone messages from this girl were found on defendant's answering machine, indicating a close relationship. In the interview, this child stated that she had gone to defendant's apartment earlier and he answered the door nude. In the apartment at that time was a nude girl who appeared to be of high school age whom the defendant identified as a student at a local high school. Detective Adkins stated in this affidavit that defendant "recalled the incident, but said he could not remember the girl's identity."

In her second affidavit, Detective Adkins stated that she observed in plain view during the first search pornographic movies alongside children's movies. Also, she found a pornographic movie which employed children's characters entitled "The Erotic Adventures of Heidi." There were bags of candy, several of which contained disposable cameras, some of which appeared to have been used. There were numerous photographs of the defendant dressed as Santa with children in his lap. There were many cards and letters obviously written by children addressed to "Santa." Also, "the apartment was full" of "enticements" for children such as toys, games, clothes, school supplies, etc.

Detective Adkins recounted that she observed local high school annuals and handbooks, all containing a listing of students' names.

5

The second affidavit then recounts that Detective Adkins observed a computer in the dining room, and on the computer table were handwritten lists of web-sites pertaining to child pornography, all in plain view. There were also handwritten addresses of web-sites of teenage girls and alongside their screen names were their real names. Detective Adkins stated that "some of the girls are under 18 years of age and...they reside within the city of Kingsport." Also there were "cards, letters and various papers that indicated ongoing communication between Mr. Sprague and children known to the affiant as being under 18 years of age." Again, all of these items were in plain view.

After reciting that in her experience child molesters often keep records of child pornography sites as well as child pornography on computers and other electronic devices, Detective Adkins stated that the defendant's three CPUs and other storage media had been given to FBI Special Agent Derek Johnson for forensic examination under the original search warrant to search for the records detailed in the first affidavit. In looking for those records, Agent Johnson immediately found pictures of minor children appearing to be under age 13 in sexually suggestive poses. He immediately stopped his work and related to Detective Adkins what he had discovered.

Do the contents of the first and second affidavits constitute probable cause for their respective purposes? Clearly, they do. The court will now examine the facts developed at the evidentiary hearing to determine if there were false or misleading statements in the affidavits or other violations of the Fourth Amendment.

Five witnesses were called by the defendant at the hearing on the motion to suppress. The first witness was Diane Burkhart, who at the time of the search was the manager of the apartment complex on Prospect Drive which of course includes the apartment searched on August 19, 2005. At some point prior to the search, Ms. Burkhart was contacted by Detective Melanie Adkins. When Detective Adkins asked if the defendant had an apartment there, Ms. Burkhart stated that it was the defendant's residence. Ms. Burkhart stated that maintenance workers earlier had reported that

defendant had changed the locks on his apartment which was prohibited by the lease and which prevented the workers from performing routine maintenance. Ms. Burkhart, at some point prior to the search, had the locks drilled and entered the apartment. Ms. Burkhart testified that the place was a mess. In her opinion, there was "no way" the defendant could be living there, and she testified that she expressed this opinion to Detective Adkins. She saw children's toys and a computer in the apartment, but does not remember if she told Detective Adkins about the computer. She testified that maintenance workers opened the door when the search warrant was executed. She didn't remember how long she had known the defendant was a registered sex offender. A log entry indicated that she learned this information in May of 2005.

The defendant next called Mary Jones, who was an employee of the Kingsport Housing Authority at the time of the August 19th search. The Housing Authority, which provides funds to low-income persons to rent public housing, has a separate lease agreement with clients such as the defendant. Of course, the owner of the apartments, the employer of Ms. Burkhart, also had a lease with its tenants, including defendant. The Housing Authority lease allows its representatives to enter an apartment on notice to the lessee. The owner's lease contained no provision for notice prior to the landlord's entry.[3] Ms. Jones stated that she was the one who made the May 18, 2005, log entry that defendant was a registered sex offender, upon being advised of this fact by Ms. Burkhart. Ms. Jones testified that on August 19th, Ms. Burkhart told her that defendant had not lived in the apartment for three years.[4] Persons who rent housing through the Housing Authority are to use it as their primary residence. Ms. Jones stated that there was enough evidence from Housing Authority inspectors to satisfy her that defendant was living there.

---

[3] In any event, whether the landlord had the right to enter defendant's apartment is of no significance in this case.

[4] An opinion that could not possibly be correct.

The next witness called by the defendant was Melanie Adkins, who was the affiant on each of the search warrants. She was assisted in preparing the affidavits by State Assistant District Attorney General Martin. The purpose of the August 19th warrant was to investigate for violations of the SOR Act and possible perjury on the part of defendant. An indictment for these offenses was handed down on August 17th, two days before Adkins obtained the search warrant.[5] Adkins stated that she talked to Ms. Burkhart two or three times during the investigation regarding the 16-year old minor referenced in the affidavit for the first search warrant. Detective Adkins said that Ms. Burkhart told her she thought the defendant still lived there because a computer was set up there. There was a phone record that Ms. Burkhart had called Adkins on August 10th. Detective Adkins was adamant that Ms. Burkhart conducted her inspection on her own initiative, and not at Adkins' request. Adkins also stated that before the search she had no suspicion that defendant might have possessed child pornography.

When she executed the first search warrant, she saw a "lot of stuff" which indicated that defendant might be collecting and viewing child pornography. As she was driving back to the station to inquire about a second search warrant, she saw the defendant and promptly requested that another officer arrest him.

Detective Adkins admitted that she did not include in the affidavit for the first warrant the fact that the defendant had already been indicted on August 17th, or that she had observed the defendant's undisclosed motor vehicles at the apartment.

On cross examination, Detective Adkins testified that defendant came in to register with the police as required by SOR on June 24th. He filed out an affidavit of indigency to avoid paying the required fee. The report form lists his address as 1436 Prospect Drive. The report listed his only

---

[5] Adkins testified she was unaware that an indictment had been returned, but it is of no significance whether she did or did not, a matter discussed hereafter.

vehicle as a Pontiac. She testified at length to the items discovered in the apartment, which is identical to the recitation set forth in the affidavit in support of the December 15th search warrant set forth above. She admitted that she already had ownership information on the undisclosed vehicles from the State of Tennessee prior to the search. She reaffirmed that all the statements in her affidavits were true and correct.

Defendant next called Detective Penny Kendall-Mikowski. She was the investigating officer regarding the case involving the 16-year old female recounted in the two affidavits and she had talked to Detective Adkins on numerous occasions about the defendant. She admitted that Mr. Sprague had been on her "radar screen" since 2000 when he was allegedly utilizing computers at Northeast State Community College to download child pornography.

The final witness called by defendant was Amy Ennis. Ms. Ennis lives in an apartment two doors down from the defendant's apartment. She testified that she had witnessed the police search the place and "take lots of stuff out." She remembered Ms. Burkhart entering the apartment earlier and was somewhat distressed that Ms. Burkhart could do that while defendant was not there. She said Ms. Burkhart was accompanied by someone who was, in her opinion, too well dressed to be a maintenance man. She also remembered seeing a person who "could have been" Detective Adkins with darker hair and another woman who came in "official type cars" going into the apartment.

At the request of the Court, both defendant and the government filed statements of the factual and legal issues to be considered regarding the four corners of the affidavits and the facts elicited at the hearing. The defendant cites four factual issues and five legal issues.

The first factual issue identified by the defendant was his assertion that Ms. Burkhart's testimony showed that Detective Adkins knew that the apartment on Prospect Drive was not the defendant's primary residence when she applied for the first warrant. However, *Mr. Sprague himself*, in order to obtain subsidy vouchers to pay the rent on the apartment at 1436 Prospect Drive,

9

listed this as his address on numerous documents submitted into evidence. Detective Adkins had observed his vehicles parked there. Even if Ms. Burkhart did tell Detective Adkins that "no one could live" in such cluttered conditions because there was "no place to sleep," the documentary evidence that defendant in fact lived there was overwhelming. To get taxpayer funded rent, defendant claimed this was his primary residence. He changed the locks to protect the apartment from lawful entry by maintenance workers. He had a numerous personal belongings there, including the computer observed by Ms. Burkhart. He parked his vehicle there. The fact that the defendant may have lied time and again in order to utilize the apartment primarily for unlawful purposes does not mean Detective Adkins could not rely upon his repeated assertions that this was his primary residence. He controlled it and claimed it as his own in order to obtain a rent subsidy. In fact, the Court is convinced that the apartment was his primary residence, its squalid condition notwithstanding.

The defendant also alleges that there was a "prior warrantless search" of the apartment either by Detectives Adkins and/or Kindle-Makowski and Ms. Burkhart, or by Ms. Burkhart "on [the detectives'] behalf." No evidence was adduced from the detectives that either of them had entered the apartment. Ms. Burkhart testified that she entered the apartment when the locks that defendant had unlawfully changed were drilled and removed at the behest of her employer. The defendant's sole direct evidence of an unlawful, warrantless search was the testimony of Amy Ennis. The defendant points outs that the government did not call Adkins or Kindle-Makowski "to refute Amy Ennis' testimony." The magistrate judge took the unusual step of ordering a transcript of the hearing to insure that his recollection of the testimony was accurate. Only after Ennis' testimony did it become clear that defendant was alleging that one or both detectives had entered defendant's apartment before the warrant-authorized search, with the connivance of Ms. Burkhart. Notwithstanding this was defendant's theory all along, counsel never asked Ms. Burkhart if she indeed had

10

aided and abetted the detectives in an illegal, warrantless entry into defendant's apartment. Detective Adkins did admit to being in the area of the apartment several times. Such is certainly not prohibited conduct, and is in fact the hallmark of competent police work. Ennis' testimony was less than unequivocal. Further, as between Detective Adkins' credibility on the one hand, and Ms. Ennis' on the other, the issue is not even close; Detective Adkins wins that contest, hands-down.

Defendant's third factual issue asks that the Court find that the detectives anticipated finding child pornography on the premises, and that this was the true object of their search. Neither the affidavit in support of the first warrant nor the testimony of Detective Adkins indicates that this was the motivation for the search and the seizure of the computer. They did not, in spite of defendant's criminal history and the results of their recent investigation, automatically assume that he was collecting child pornography. What they did know was that he was almost certainly violating the SOR Act by portraying Santa Claus and making false statements under oath regarding his ownership of vehicles. Defendant alleges that Detective Kindle-Makowski was targeting defendant, and had him "on her radar screen" because of his criminal history and the allegations that he was downloading child pornography on the community college computer. Also, he complains of Detective Adkins "nonchalant demeanor in the courtroom"[6] and the fact that the offenses for which she was collecting evidence were, at worst, minor felonies, and that her real motivation was her "obvious feelings" about Sprague. When a person is convicted of certain sex crimes against children and compelled to register as a violent sexual offender, they *should* be "on the radar" of law enforcement agencies. To be sure, they cannot be harassed beyond the "harassment" which the law itself constitutionally allows, such as being required to register, provide personal information, and reside in limited areas. Their Fourth Amendment rights against unreasonable searches and seizures remain

---

[6]This magistrate judge did not observe a "nonchalant" demeanor. What was observed was a very professional, competent, self-assured, and knowledgeable witness.

11

fully viable. But the personal "feelings" or attitudes of officers who investigate and prosecute crimes against exploited children are not the issue; Detective Adkins is not required to "like" Mr. Sprague. Indeed, what she knew before seeking the first search warrant strongly suggested he was violating the SOR Act and perhaps far worse. This, however, does not mean that she was looking for child pornography when she obtained the first warrant. As already stated above, absent a material misstatement, the affidavit for that warrant contained abundant probable cause to seize the computer in order to search it for information regarding the automobiles and the status of the minor children allegedly residing with the defendant.

The final factual issue raised by the defendant is that Detective Adkins intentionally did not include in her first affidavit the fact that the defendant had been indicted two days previously. According to defendant, since she already had evidence that he was portraying Santa and that he owned vehicles he had not listed in his SOR registration, she should not be allowed to search for more evidence of these crimes. According to defendant, by failing to reveal the fact that defendant had already been indicted "misled the magistrate to believe that additional information was needed for the finding of probable cause." In his statement of legal issues, defendant concedes that search warrants can be issued after indictments are returned, but that it is "waste of grand jury resources and court resources for officers to go to the grand jury before they have their needed proof." Defendant says that obtaining the indictment before obtaining all of the proof "speaks volumes as to the detectives' true intentions." By that statement, the Court assumes defendant means to suggest that the officers wanted to find evidence of more serious crimes than those set forth in the indictment. If wishes were horses, beggars would ride; whatever "wishes" the officers may have had are irrelevant. What is relevant is that Detective Adkins had probable cause to get the warrants she obtained and thereafter executed. It is one thing to persuade a grand jury that there is probable cause to believe defendant portrayed Santa, but it is quite another to actually obtain the

12

paraphernalia of Santa Claus from the defendant's residence in order to show it to a trial jury to establish guilt beyond a reasonable doubt. The fact that evidence of more serious criminal activity may be revealed in a legitimate search for additional evidence is simply not germane.

Defendant's first legal issue is that Detective Adkins made material misstatements as to the apartment being defendant's "primary residence" and by her failure to reveal the return of the indictment by the grand jury. Both of these issues have been discussed previously.

The second factual issue deals with whether the actions of Ms. Burkhart "on behalf of the detectives" constituted a private search and whether the detectives' actions constituted prior warrantless searches. Defendant has the burden of proof on this issue. Not only has defendant failed to carry his burden, the evidence actually preponderates in favor of the government; Ms. Burkhart acted on her own and under the authority of the lease. The evidence also fails to prove that either of the detectives entered the apartment prior to the execution of the warrant.

The third legal issue raised by defendant argues that even if the search warrant was valid, the officers' immediate discovery of the Santa Claus suit gave them all the proof they needed and they should have stopped immediately and departed. Otherwise, so defendant posits, the warrant was "too general in nature." As previously stated, evidence regarding the vehicles and the minor children residing at the residence could easily have been stored in the apartment and on the computer. Nothing else need be said.

The next legal issue raised by the defendant rehashes his belief that the officers were using the warrant as a pretext to discover evidence of possession of child pornography. The defendant cites the case of *United States v. Pope*, 452 F.3d. 338 (5th Cir. 2006). In *Pope*, a police officer had previously made an undercover purchase of prescription drugs from the defendant. Seventy eight days later, he received a tip that the defendant was running a meth lab. Concluding he lacked probable cause to obtain a warrant to search for a meth lab, he instead presented an affidavit

regarding his purchase of prescription pills from the defendant and obtained a warrant to search defendant's residence for prescription pills. During the search, he found the meth lab. At the suppression hearing, the officer admitted numerous times that he was merely using the warrant regarding the prescription pills to look for evidence the meth lab. In a split decision, the Fifth Circuit suppressed the illegally obtained evidence.[7]

Obviously, in *Pope* there was direct evidence from the officer's own mouth concerning his true motives. In the present case, there is merely innuendo and speculation in the face of emphatic denials from Detective Adkins that she was using an illegal short cut to obtain evidence of a more serious crime. The evidence heavily preponderates in favor of the government.

The final legal issue raised by defendant states that proof relating to the currency and other evidence discovered during the searches is a "red herring" to influence the Court. Suffice it to say, the magistrate judge was not influenced by the evidence of the currency to report one way or the other. What that evidence may have to do with defendant's prosecution on state charges, if that comes to pass in the discretion of the state district attorney general, is of no concern to the present inquiry.

In summation, probable cause existed for the issuance of both search warrants. Further, the clear preponderance of the evidence indicates that there were no material misstatements of facts, or withholding of material facts. The warrant was not "general" and the search was not overly broad or for an undisclosed purpose. It is recommended that the Motion to Suppress be **DENIED**.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v.*

---

[7]The *Pope* opinion is, with all respect, on shaky legal ground. The dissent correctly points out that an officer's subjective motives are never the issue; *cf.*, *Whren v. United States*, 517 U.S. 806 (1996).

14

*Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, or (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

    RESPECTFULLY SUBMITTED,

     s/Dennis H. Inman
    Dennis H. Inman
    United States Magistrate Judge